**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|                        |     |                        |
|------------------------|-----|------------------------|
| SUPER SLAM, LTD,       | )   |                        |
|                        | )   |                        |
| Plaintiff,             | )   |                        |
|                        | )   | C.A. No. 21-1034-CFC   |
| v.                     | )   |                        |
|                        | )   |                        |
| ATP TOUR, INC.,        | )   |                        |
|                        | )   |                        |
| Defendant.             | )   |                        |
|                        | )   |                        |

**ANSWER AND AFFIRMATIVE DEFENSES**

Defendant ATP Tour, Inc. ("ATP"), by and through its undersigned counsel, hereby submits its Answer and Affirmative Defenses to the Complaint of Plaintiff Super Slam, Ltd ("Super Slam").

**ANSWER**

NATURE OF ACTION

1.      Defendant ATP is a Delaware membership corporation whose members are comprised of entities operating men's professional tennis tournaments and men's professional tennis players.  The ATP sanctions and administers men's professional tennis tournaments.

**Answer:**      Admitted.

2.      Plaintiff Super Slam owns and operates the Madrid Open, which ATP sanctions as one of nine top-tier men's tennis tournaments comprising the "ATP Tour Masters 1000s" of the ATP Tour.  The Madrid Open originated in 1990 (at that time located in Stockholm) as a "Single Week" tournament on the ATP Tour—a designation contemplating that the Open would be the "single" ATP Tour tournament during its allotted time (then a week), rather than being "doubled up" with other tournaments.  The Madrid Open is also one of the four top-tier "Premier Mandatory" events on the Women's Tennis Association ("WTA") Tour.

**Answer:**      ATP lacks sufficient knowledge to admit or deny whether Super Slam owns the

Madrid Open.  ATP admits that it sanctions the Madrid Open as one of nine top-tier men's tennis

tournaments comprising the "ATP Tour Masters 1000s" of the ATP Tour, and admits that the

Madrid Open also includes a WTA "Premier Mandatory" event.  ATP denies the remaining

allegations in Paragraph 2.

3.     On February 2, 2007, Evington Finance Corp. ("Evington"), the prior owner of the Madrid Open, submitted an application for a sanction for an ATP Tour Masters 1000 combined tournament to be held in Madrid, Spain (the "Application").  ATP approved the Application in an April 16, 2008 letter from ATP Europe CEO Andy Anson to Evington President Rudolph V.A. van der Wall Arnemann.  The letter, together with the Application, constitute the Sanction Agreement.  As noted above, the Madrid Open already was an ATP-sanctioned Single Week tournament in Madrid at that time, and no provision of the Sanction Agreement states anything to alter that fact.  Rather, the Sanction Agreement merely restated certain already-existing sanction rights and granted the Madrid Open calendar protection for the month of May.

**Answer:**     ATP admits the allegations in the first two sentences of Paragraph 3, except denies

that Evington submitted its application on February 2, 2007.  The remaining allegations in

Paragraph 3 are legal conclusions as to which no answer is required.  To the extent a response is

required, ATP denies the remaining allegations in Paragraph 3 other than to state that the

Application and April 16, 2008 letter speak for themselves, and ATP respectfully refers the Court

to them for a full statement of their contents in context.

4.     Evington operated the Madrid Open until January 2012, when Evington and Super Slam (an affiliated company) entered into an assignment under which all rights, responsibilities, and obligations of Evington under the Agreement were fully assigned to Super Slam.  ATP consented to this intra-group transfer.

**Answer:**     ATP admits that in or about November 2011, it approved a transfer of Evington's

Tournament Class membership with respect to the Madrid tournament to Super Slam.  ATP lacks

sufficient knowledge to admit or deny the remaining allegations in Paragraph 4.

5.     Super Slam has operated the Madrid Open on an annual basis from 2012 to 2019 and in 2021.  The tournament was not held in 2020 due to the COVID-19 pandemic.

**Answer:**      ATP admits that the Madrid Open was operated from 2012 through 2019 and in

2021, and that it was not held in 2020 due to the COVID-19 pandemic.  ATP denies the remaining

allegations in Paragraph 5.

6.      This action concerns a series of bad faith and unfair measures ATP has imposed
upon the Madrid Open in violation of Super Slam's Sanction Agreement, which have thwarted
Super Slam's reasonable expectation of receiving the fruits of its bargain and caused severe injuries
and damages to Super Slam.

**Answer:**      Denied.

7.      Specifically, each year and to an increasing extent, ATP has abused its claimed
"discretion" to schedule other tournaments so they are adjacent to and overlap with the Madrid
Open.  The resulting conflicts deprive the Madrid Open of top players for several days each year,
depriving it of the eight-day tournament to which it is entitled.  Contrary to the promise of the
Sanction Agreement, the Madrid Open has been effectively relegated to a four or five-day
tournament for the top players.  This is contrary to Super Slam's reasonable expectation that ATP
would act in good faith and avoid scheduling conflicting tournaments, consistent with the Madrid
Open's longstanding status as a "single week" tournament under ATP's Bylaws—*i.e.*, not a
"Double Up" tournament in which another tournament is typically scheduled during the same
week.

**Answer:**      ATP denies the allegations in Paragraph 7, except admits that it has the discretion

and authority to schedule other ATP tournaments so they are adjacent to and overlap with the

Madrid Open.

8.      Making matters worse, ATP now allows top players to skip far more Masters 1000
tournaments each year than when the Sanction Agreement was entered into in 2008.  This further
violates ATP's contractual commitment that top players would be required to play in the Madrid
Open, subject only to certain players' right to skip no more than one tournament each year.

**Answer:**      ATP denies the allegations in Paragraph 8, except admits that its rules with respect

to certain players' obligations to play all Masters 1000 events have been modified over time, and

respectfully refers the Court to them for a full statement of their contents in context.

9.      The combined effect of these bad faith decisions by ATP is to deprive Super Slam
of the benefit of its bargain to have the top players available to it for an eight-day tournament each
year.  Instead, because of ATP's bad faith behavior, the top players are incentivized to skip or
show up late for the Madrid Open due to conflicts with and recovery time from other tournaments,
and ATP each year permits them to do so.  This bad faith conduct by ATP has thwarted, and

continues to thwart, Super Slam's contractual entitlement to run an eight-day Masters 1000 tournament and is unfair dealing depriving Super Slam of the reasonably expected benefits of the parties' agreement.

**Answer:**       Denied.

10.     At the same time that ATP has deprived Super Slam of the benefit of its bargain to conduct an eight-day tournament with the top players available, the ATP has also required the Madrid Open each year to pay more in prize money than other comparable eight-day Masters 1000 tournaments, on a bad faith basis adverse to the Madrid Open and contrary to the terms of the Sanction Agreement.  In fact, ATP has required the Madrid Open to pay a disproportionately high amount of prize money for the size of the tournament, as it has only a 56-player draw but pays nearly as much in prize money as the BNP Paribas Open (Indian Wells Masters) and Miami Open, which each have 96-player draws.  This means the Madrid Open is paying much more in prize money on a per player basis than other Masters 1000 events.

**Answer:**       Denied.

11.     For example, Super Slam has had to pay over $1 million more each year in prize money for the Madrid Open than the Italian Open in Rome—even though both are eight-day, 56-player, clay-court tournaments played in May in major European capitals.  Further, ATP has required Super Slam to pay almost as much prize money for the Madrid Open as two *twelve-day* tournaments—the Miami Open and BNP Paribas Open—that have received full exclusivity so no other tournaments overlap.  This disproportionate prize money commitment has further compounded the injuries Super Slam has suffered by not being able to conduct at least the eight-day tournament it has been promised with the top players participating.  In these circumstances, it has been an abuse of ATP's discretion, and beyond any contractual or other rights ATP may have, to continue to impose such disproportionate prize money commitments on the Madrid Open each year in comparison to the other eight-day events like the Italian Open in Rome.

**Answer:**       Denied.

12.     This discriminatory status and treatment by ATP is not what was bargained for and is inconsistent with ATP's covenant of good faith and fair dealing and the terms of the Sanction Agreement.  Super Slam thus seeks damages for the injuries it has incurred during the last three years as a result of these contractual breaches and bad faith conduct.

**Answer:**       ATP denies the allegations in the first sentence of Paragraph 12, except admits that

Super Slam purports to seek damages, but denies that Super Slam is entitled to any damages.

13.     In addition, to ensure that Super Slam receives the benefit of its bargain going forward, Super Slam seeks a declaratory judgment and permanent injunction regarding the rights and obligations of the parties under the Sanction Agreement, including requiring ATP to halt its unreasonable abuse of its discretion with respect to scheduling and prize money, which treats Super Slam in a discriminatory manner in comparison to other ATP Tour Masters 1000s and is contrary

to the Sanction Agreement and its reasonable expectations thereunder, and further is contrary to the Madrid Open's contractual and other rights, including its preexisting and continuing status as a single week tournament.

**Answer:**     ATP denies the allegations in Paragraph 13, except admits that Super Slam purports

to seek a declaratory judgment and a permanent injunction, but denies that Super Slam is entitled

to any such relief.

14.     Finally, Super Slam demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

**Answer:**     ATP admits that Super Slam purports to seek a trial by jury.

## PARTIES

15.     Plaintiff Super Slam is an entity organized and existing under the laws of Cyprus, having a principal place of business at 77 Strovolos Centre, Flat 303, Strovolos, Cyprus.  Super Slam owns the sanction to the Madrid Open, an ATP Tour Masters 1000 / Premier Mandatory WTA combined (i.e., men's and women's) professional tennis tournament.  The women's division, operated by the WTA, is not at issue in this litigation.

**Answer:**     ATP admits that Super Slam owns an ATP sanction with respect to the Madrid

Open, which has been designated by ATP as a Masters 1000 tournament.  ATP admits that the

Madrid Open is a combined event and that Super Slam avers that the women's event is not at issue

in this litigation.  ATP lacks sufficient knowledge to admit or deny the remaining allegations in

Paragraph 15.

16.     Defendant ATP is an entity organized and existing under the laws of the state of Delaware, with its principal place of business at 201 ATP Tour Boulevard, Ponte Vedra Beach, Florida 32082.  ATP operates nine ATP Tour Masters 1000 tournaments, which are the most prestigious tennis tournaments operated by ATP.

**Answer:**     ATP admits the allegations in the first sentence of Paragraph 16 and denies the

allegations in the second sentence of Paragraph 16

17.     As the owner of the sanction to an ATP tournament, Super Slam is a tournament class member of ATP pursuant to the ATP Bylaws.  *See* Art. III, V.

**Answer:**     Admitted.

18.     As a member of ATP, Super Slam is required to comply with: "(i) the ATP Certificate of Incorporation; (ii) the ATP By-Laws; (iii) the rules set out in the ATP Official Rulebook; (iv) all resolutions of the Board of Directors of the ATP; and (v) all other rules, regulations, and governing agreements among the ATP and its members; as each of such documents are amended, supplemented and/or restated from time to time."  Application § 6(4).

**Answer:**     ATP admits that Paragraph 18 accurately quotes section 6(4) of the Application, respectfully refers the Court to the Application for a full statement of its contents in context, and admits that Super Slam is required to comply with, *inter alia*, each of the enumerated items set forth in section 6(4) of the Application.

19.     The ATP Bylaws, last amended on November 3, 2011, set forth the governance structure of ATP; the terms and conditions of tournament, player, and coach class membership; ATP Board, Player Council, and Tournament Council procedures; the powers and duties of ATP Board representatives, committees, and officers, including the Chairman and President; and more.

**Answer:**     ATP admits that its Bylaws, among other governing documents, contain provisions covering the topics mentioned in Paragraph 19, and respectfully refers the Court to the Bylaws for a full statement of their contents in context.  ATP denies the remaining allegations in Paragraph 19.

20.     According to the ATP Bylaws, the purposes and powers of ATP are "to own, sanction, schedule, and administer one or more circuits of professional tennis tournaments, but not to own the assets of any individual member of the League; to own one or more professional tennis tournaments which are not owned by any member of the League; to sanction, schedule and operate one or more professional tennis tournaments; to develop, promulgate and administer rules, regulations and grievance procedures to ensure the fair and orderly conduct of professional tennis tournaments, circuits thereof and the sport of professional tennis; to promote and further the interests of professional tennis players and professional tennis tournaments and circuits thereof throughout the world; to promote the interests of one or more public charities; to improve the conditions under which professional tennis players engage in their occupation; to improve the status and public perception of professional tennis as a major world class international sport; to promote and protect the future of the sport of professional tennis; and to encourage interest in the sport of tennis."  *See* Art. II.

**Answer:**     ATP admits that Paragraph 20 accurately quotes a portion of section 2.1 of the ATP Bylaws and respectfully refers the Court to the Bylaws for a full statement of its contents in context.

21.    The ATP Rules, updated annually, lay out the on-court and off-court regulations for players and tournaments on the ATP Circuit.

**Answer:**    ATP admits that the ATP Rulebook is updated at least annually and that it, among other governing documents, sets forth certain on-court and off-court regulations for players and tournaments on the ATP Tour, and respectfully refers the Court to the ATP Rulebook for a full statement of its contents in context.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(2), as the Parties are of diverse citizenship and the amount in controversy exceeds $75,000.  Plaintiff Super Slam is a citizen or subject of Cyprus and Defendant ATP is a citizen of the state of Delaware.

**Answer:**    ATP lacks sufficient knowledge to admit or deny allegations concerning Super Slam's citizenship.  ATP admits that it is incorporated in Delaware.  The remaining allegations in Paragraph 22 are legal conclusions as to which no answer is required.

23.    This Court has personal jurisdiction over Defendant ATP because ATP is incorporated in Delaware.

**Answer:**    The allegations in Paragraph 23 are legal conclusions as to which no answer is required.

24.    Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c), because Defendant ATP is incorporated in Delaware.

**Answer:**    ATP admits that it is incorporated in Delaware.  The remaining allegations in Paragraph 24 are legal conclusions as to which no answer is required.

25.    Furthermore, both parties have consented to this Court's jurisdiction through agreement to abide by the ATP Bylaws, which state in relevant part:

> Jurisdiction and Venue. (a) Each member, for himself or itself and on behalf of its owners and affiliates (collectively, "Owners") (i) submits to the jurisdiction of the Chancery Court of the State of Delaware and the United States District Court for the District of Delaware, (collectively, "Delaware Courts") … and (iii) irrevocably

agrees to be bound by any final judgment of any Delaware Court.
The foregoing submission to personal jurisdiction is self-operative
and no further instrument or action, other than service of process in
the manner permitted by the rules and procedures established by the
applicable Delaware Court or any applicable law, shall be necessary
in order to confer such personal jurisdiction over any member or any
of its Owners, affiliates or representatives.

§ 23.1.

**Answer:**     ATP admits that Paragraph 25 accurately quotes a portion of section 23.1(a) of the

ATP Bylaws and respectfully refers the Court to the Bylaws for a full statement of its contents in

context.  The remaining allegations in Paragraph 25 are legal conclusions as to which no answer

is required.

## FACTUAL BACKGROUND

26.     Founded in 1972, ATP describes itself as the "global governing body of men's
tennis."   ATP operates three men's professional tennis circuits—the ATP Tour, the ATP
Challenger Tour, and the ATP Champions Tour.  Of these three circuits, the ATP Tour is the
highest level, featuring the top men's tennis players in the world.

**Answer:**     ATP denies the allegations in the first sentence of Paragraph 26 and admits the

remaining allegations in Paragraph 26.

27.     The ATP Tour is made up of three levels of tennis tournaments: ATP Masters 1000,
ATP 500, and ATP 250 level events.  While all members of the Tour may participate in any level
ATP event, the ATP Masters 1000 events are considered the most prestigious, typically offering
the largest amounts of prize money, attracting the top players (who are required to play in these
events), producing the greatest fan interest, and generating the most revenue of the tournaments
ATP operates.  The four tennis Grand Slam events (U.S. Open, Wimbledon, French Open, and
Australian Open) are separate entities that are not operated by ATP.

**Answer:**     ATP admits that, among other events, the ATP Tour has three levels of tennis

tournaments – the ATP Masters 1000, ATP 500, and the ATP 250 events, and admits that the

Grand Slams are not operated by ATP, but denies the remaining allegations in Paragraph 27.

28.     As set forth further below, ATP abuses its discretion, under its own Rules, to set
the schedule for ATP Tour 1000, 500, and 250-level events, as well as the ATP Finals tournament.
ATP also abuses its discretion to set the prize money each year for the different ATP Tour 1000-

level events.  ATP has abused and exceeded that discretion, which is not unlimited and is subject to its other legal and contractual obligations, including to Plaintiff, as described further below.

**Answer:**     Denied.

29.     ATP supervises nine ATP Tour Masters 1000 tournaments over the course of a typical season, which are owned by different sanction holders and take place around the world—Indian Wells, California (BNP Paribas Open); Miami, Florida (Miami Open); Roquebrune-Cap-Martin, France (Monte-Carlo Masters); Madrid, Spain (Madrid Open); Rome, Italy (Italian Open); Montreal and Toronto, Canada (Canadian Open); Mason, Ohio (Cincinnati Masters); Shanghai, China (Shanghai Masters); and Paris, France (Paris Masters).

**Answer:**     Admitted.

30.     The Madrid Open originated as the Stockholm Open, which joined the ATP as a "Championship Series Single Week" tournament in 1990. The tournament subsequently relocated from Stockholm, Sweden to Essen, Germany in 1995, and to Stuttgart, Germany a year later, before finally settling in Madrid in 2002 and continuing there through the present. During that time, the formal category for Championship Series Single Week tournaments such as the Madrid Open was renamed first to the "Super 9" and then to the "Masters Series," before arriving at the current "Masters 1000" moniker.

**Answer:**     ATP denies the allegations in Paragraph 30, except, on information and belief, admits that the ATP membership with respect to the tournament in Stockholm, Sweden was acquired by Ion Tiriac in or about 1996, and then the tournament was subsequently relocated from Stockholm to Essen, Germany, and then to Stuttgart, Germany, and then to Madrid, Spain.

31.     As reflected in the "Championship Series Single Week" name, the distinguishing feature of this exclusive group of tournaments was that each was to be scheduled for a full week or longer during which a *single* ATP tournament would be held. In contrast, other, lower-tier tournaments were known as "Double Up Week" tournaments because they could be "doubled up" with other ATP tournaments during the same week-long period.

**Answer:**     Denied.

32.     The ATP Bylaws recognize this distinction between "single week" and "double up week" tournaments, setting forth a heightened voting requirement for the ATP Board to "change the status of a Championship Series member of the Tournament Class of the League from a 'single week' Championship Series tournament to a 'double up week' Championship Series tournament." § 12.9(l).

**Answer:**      ATP admits that Paragraph 32 accurately quotes a portion of section 12.9 of ATP's

Bylaws and respectfully refers the Court to the Bylaws for a full statement of its contents in

context.  ATP denies the remaining allegations in Paragraph 32.

33.   The Application for the Madrid Open stated that "[b]y submitting this Application, the applicant is committing the Tournament owner(s) to the obligation of staging the proposed Tournament on the terms and in the manner described in this Application," upon acceptance of the Application by ATP.  § 6(1).

**Answer:**      ATP denies that Paragraph 33 accurately quotes section 6(1) of the Application,

and respectfully refers the Court to the Application for a full statement of its contents in context.

34.   Section 2.5 of the Application stated that, as a 1000-level European outdoor clay-court tournament, the Open would be an eight-day tournament during Week 20 of the tennis season.  The duration of the tournament and its placement in the calendar are an intrinsic and essential element of Super Slam's rights under the Sanction Agreement.  The ability for a tournament in a given location to operate profitably and attract audiences and viewership turns, to a large extent, upon when in the calendar year it falls, how many days it is allotted, and what other ATP Tour tournaments occur during the same period.  By determining a tournament's schedule in comparison to other tournaments, ATP can help a tournament succeed—or severely harm its ability to be run successfully and profitably by scheduling conflicting tournaments.

**Answer:**      ATP denies the allegations in the first sentence of Paragraph 34 and respectfully

refers the Court to the Application for a full statement of its contents in context.  The allegations

in the second sentence of Paragraph 34 are legal conclusions as to which no answer is required.

ATP denies the remaining allegations in Paragraph 34, except admits that there are a number of

factors that determine whether a tournament will be profitable and the degree to which it attracts

audiences and viewership.

35.   The Application also provided that there would be "[n]o change in [the] current rule for entry to Masters events."  § 2.2. In that regard, at the time the Application was made and later accepted, the ATP Rules provided that the fifty top-ranked players from the previous year's final ranking, known as "commitment players," would be required "to participate in the singles event of *all* ATP Masters Series Tournaments," including the Madrid Open.  *See* § 1.07(C)-(D) (emphasis added).  In addition, Section 2.2 of the Application contained a "[m]andatory [p]layer [c]ommitment" for Madrid as an ATP Tour Masters 1,000 tournament, which specified that "[a]ll players are automatically entered" and "[t]hose that qualify *must* play these events," with only one exception: "[e]ffective for 2009, any player who has reached the age of 30 or has 10 years of

service (as currently defined) will be exempted from the additional penalties for not playing *one* Masters 1,000 event" per year. § 2.2 (emphasis added).

**Answer:**     ATP denies the allegations in Paragraph 35, except admits that Paragraph 35 accurately quotes certain portions of section 2.2 of the Application, and respectfully refers the Court to the Application and to the ATP Rulebook for a full statement of their contents in context.

36.     Since Super Slam acquired the sanction to the Madrid Open, the tournament has attracted hundreds of thousands of fans to the Caja Mágica stadium while generating hundreds of millions of dollars in revenue for the city of Madrid every year.

**Answer:**     ATP lacks sufficient knowledge to admit or deny the allegations in Paragraph 36.

37.     Despite Super Slam's success in attracting high consumer interest in the Madrid Open and thus promoting the broader sport of professional tennis—consistent with ATP's stated mission to "serve tennis"—ATP continually has given it second-rate treatment in violation of its rights and reasonable expectations under the Sanction Agreement.

**Answer:**     Denied.

38.     In particular, ATP has rendered the Madrid Open's eight-day guarantee effectively nugatory by scheduling other ATP Tour tournaments to substantially overlap with the Madrid Open. This has also deprived Super Slam of the value of the "mandatory player commitment," as the extent of the overlap has interfered with top player availability for the first several days of the Madrid Open—both for playing in the tournament and for purposes of engaging in promotional work in support of the tournament—as required under ATP Rules, as explained further below.

**Answer:**     Denied.

39.     For example, two ATP World Tour 250-level tournaments—the BMW Open in Munich, Germany and the Millennium Estoril Open in Estoril, Portugal—repeatedly have been scheduled on a yearly basis to conclude on the same day that the Madrid Open begins play, with the result that finalists in prior ATP events are only able to begin play in Madrid on Wednesday, midway through the tournament week.

**Answer:**     ATP denies the allegations in Paragraph 39, except admits that the events in Munich, Germany and Estoril, Portugal have been scheduled to conclude on the same day that the Madrid Open is scheduled to begin.

40.     On information and belief, the BMW Open championship match has taken place on the first day of the Madrid Open every year since 2009 (other than in 2020, when the BMW Open was not played due to the COVID-19 pandemic). On information and belief, the Estoril

Open's championship match, or the championship match of its precursor, the Portugal Open, has also taken place on the first day of the Madrid Open every year since 2009 (other than in 2020, when the Estoril Open was not played due to the COVID-19 pandemic).

**Answer:**      ATP admits the allegations in the second sentence and that the BMW Open and the

Estoril Open were not held in 2020 due to the COVID-19 pandemic, but denies the remaining

allegations in Paragraph 40.

41.      As a result of these bad faith scheduling decisions by ATP, it has not been possible for top players who reach the final rounds of the preceding tournaments to be in Madrid on its first day to either engage in required promotional activities or to play in a match, as they are concurrently participating in another ATP event taking place in a different country. Furthermore, after completing the preceding tournament, players often take additional time for travel and rest. As a result, many are not able to begin play or promotional activities at the Madrid Open until the following Tuesday or Wednesday. This causes serious harm to Super Slam's ability to promote the Madrid Open during that period. Tennis players are not interchangeable—top players are selected for promotional activities based on factors such as their rankings, demonstrated promotional abilities, and connections with the target audiences.

**Answer:**      ATP lacks sufficient knowledge to admit or deny the allegations in the last sentence

of Paragraph 41 and denies the remaining allegations in Paragraph 41.

42.      Under the ATP Rules, players are "required, if requested, to take part in media availability prior to their first match at each tournament." Rule 8.04(4)(q). Players also must agree "to participate upon request in reasonable promotional activities of ATP and ATP Tour tournaments and events in which [they are] entered, subject to [their] reasonable availability to participate therein." Rule 1.13(B). Such promotional activities include, for example, press interviews with media partners, clinics with guests of sponsors, signature sessions, and official presentations, and are arranged by the tournaments in coordination with the ATP players services team. Further, "if requested," players are "obligated to conduct visits to private sponsor lounges" and "sponsor public booths" and to "participate in official tournament activities." Rule 1.14(C)-(E).

**Answer:**      ATP admits that Paragraph 42 accurately quotes portions of Rules 8.04(M)(4)(q),

1.13(B), and 1.14(C)-(E) of the ATP Rulebook and respectfully refers the Court to them for a full

statement of their contents in context.

43.      ATP's scheduling of tournaments to overlap and conflict with the Madrid Open each year, in violation of its contractual obligations and covenants of good faith and fair dealing, makes it impossible for some top players to be "reasonably availabl[e]" to take part in media interviews, promotional events, sponsor visits, and other official tournament activities during the

Madrid Open's first few days, as is required of them should the Madrid Open "request" that they be available during this period.  This has inflicted serious damages on Super Slam, since—as ATP knows well—Super Slam has been deprived of the ability to conduct the full range of promotional activities it otherwise would be able to conduct during the eight days it is entitled to.

**Answer:**      Denied.

44.      For example, since 2009, top men's singles players, including Andy Murray, Dominic Thiem, Alexander Zverev, Juan Martín del Potro, Stanislas Wawrinka, Marin Čilić, Stefanos Tsitsipas, David Ferrer, Tomáš Berdych, Philipp Kohlschreiber, Richard Gasquet, and Tommy Haas have played in the finals of either the BMW Open or the Estoril Open, rendering them unable to compete or participate in promotional events at the Madrid Open during the initial several days of competition. As explained above, this has severely harmed Super Slam's ability to conduct profitable and successful promotional activities during the interim period, as such top players who are missing cannot effectively be replaced with other players for promotional purposes.

**Answer:**      Denied.

45.      Meanwhile, ATP repeatedly has scheduled another ATP Masters 1000 Tournament, the Italian Open, to begin play in Rome on the Madrid Open's final day, costing the Madrid Open's championship match media attention, advertising dollars, and viewership.  On information and belief, ATP has done so in every year from 2011 to 2019 and in 2021 (neither the Madrid Open nor Italian Open occurred in May 2020 due to the COVID-19 pandemic), in contravention of its good faith scheduling obligation to ensure that the Madrid Open would enjoy a full eight tournament days.

**Answer:**      ATP denies the allegations in Paragraph 45, except admits that the Italian Open was

scheduled to begin on the same day as the finals of the Madrid Open in 2011 through 2019 and in

2021.

46.      The effect of ATP's bad-faith scheduling decisions each year is to effectively cut the Madrid Open's contractually allotted eight days of exclusivity to four or five days.  In doing so, ATP repeatedly has breached its contractual obligation under the Sanction Agreement to provide the Open with an eight-day event in which the top players are fully available to play and participate in promotional activities and deprived the Madrid Open of the fruits of the bargain reasonably contemplated under that Sanction Agreement.  This is particularly true given the Madrid Open's status as a "Single Week" tournament rather than a "Double Up Week" tournament, and thus the reasonable expectation when the Sanction Agreement was that ATP would not destroy the value of the contract by "doubling up" the Madrid Open each year with other tournaments.

**Answer:**      Denied.

47.     As former ATP Board member and ATP Media Chief Executive Officer Mark Webster has acknowledged, scheduling other tournaments to overlap or conflict with the Madrid Open is inconsistent with its status as "an 8 day single week event," and a "situation where [a top player] plays a final in another event [during the Madrid Open] breach[es] the exclusivity of the event" and "cause[s] … damage to its reputation and its business."

**Answer:**      Denied.

48.     Compounding on these harms, ATP has not abided by its commitment in the Sanction Agreement that there would be "[n]o change in [the] current rule for entry to Masters events." § 2.2. To the contrary, ATP now only requires the *thirty* top-ranked players to participate in Masters 1000 events like the Madrid Open—not the top fifty players, as was and is required under the Sanction Agreement. *See* Rule 1.07(C), (D).

**Answer:**      Denied.

49.     Further, under new rules ATP adopts on a yearly basis, ATP now allows these top-thirty players several exemptions each year to the mandatory participation requirement and grants some longtime players—including a number of the most famous in tennis—complete exemption from the mandatory participation requirement altogether. *See* Rule 1.08(A).

**Answer:**      ATP denies the allegations in Paragraph 49, except admits that it has rules with respect to the reduction of the ATP Tour Masters 1000 player commitment for certain players, and respectfully refers the Court to its Rulebooks for a full statement of their contents in context.

50.     The combined effect of these breaches by ATP is that, each year, ATP permits far more players to skip the Madrid Open than was contemplated under the Sanction Agreement—violating ATP's ongoing contractual commitment to allow only one such exemption and its duty of good faith and fair dealing under that Agreement.

**Answer:**      Denied.

51.     During this period, Super Slam has paid an extra "Sanction Protection Fee" every year in excess of €200,000 to ensure its events are granted protection from a category change from its 1000-level status. Yet, by depriving it of the reasonably expected fruits of an eight-day tournament, Super Slam's single-week Masters 1000 category status has not been protected.

**Answer:**      Denied.

52.     At the same time that ATP has not honored its contractual commitments to Super Slam, ATP has not hesitated to abuse and exceed its discretion with regard to prize money by requiring annual top-rate prize money payments by the Madrid Open that are considerably higher than the prize money commitments imposed on its comparable peer tournaments.

**Answer:**       Denied.

53.       For example, each year, ATP has required the Madrid Open to pay over $1 million more in prize money than the Italian Open, even though the Madrid and Italian Opens are both eight-day, 56-player, clay-court tournaments played in May in major European capitals.   For example, the Madrid Open paid $7,379,023.40 and $7,255,137.60 in prize money in 2018 and 2019, while the Italian Open paid $5,797,804.95 and $5,780,219.55, respectively.

**Answer:**       Denied.

54.       In 2020, before it was canceled due to the COVID-19 pandemic, the Madrid Open was set to be required to pay €5,383,275 in prize money, over €1 million more than the 56-player, European clay court tournaments in Rome and Monte Carlo were going to be required to pay (€4,346,845 each).

**Answer:**       Denied.

55.       In 2021, the Madrid Open was required to pay €2,614,465 in prize money and make a total financial commitment of €3,226,325, while the comparable events in Rome and Monte Carlo have only been required to pay €2,082,960 in prize money and make a total financial commitment of €2,563,710 (Italian Open) or €2,460,585 (Monte Carlo Masters).

**Answer:**       ATP admits that Paragraph 55 accurately states the amounts of prize money and the total financial commitment for each of the Madrid, Rome, and Monte Carlo events, and denies the remaining allegations in Paragraph 55.

56.       Indeed, ATP has required that the Madrid Open annually pay nearly as much prize money as it requires of the BNP Paribas Open and Miami Open, even though both those tournaments are afforded *twelve exclusive* tournament days, during which no other ATP tournaments are scheduled.  From 2009 through 2019, the Madrid Open was required to pay a total of $55,866,186.60 in prize money—nearly the same amount of prize money that the BNP Paribas Open ($60,903.192.00) and the Miami Open ($58,800,335.00) paid during that period, despite the Madrid Open only being allotted eight days that the ATP has "doubled up" with other tournaments, contrary to the Open's Single Week designation.  The fact that ATP is requiring the Madrid Open to pay a disproportionately high amount of prize money for the size of tournament it has been allotted is made all the clearer by the fact that the BNP Paribas Open and Miami Open each have 96-player draws, while the Madrid Open has only a 56-player draw.

**Answer:**       ATP denies the allegations in Paragraph 56, except admits that Paragraph 56 accurately states the amount of prize money that the BNP Paribas Open and the Miami Open were required to pay from 2009 through 2019.

57.     The Madrid Open is allotted only 66.7% as many tournament days as the BNP Paribas Open and the Miami Open, and only *33.3%* as many unconflicted days, as well as a much smaller draw.  Yet in 2018 alone, the Madrid Open paid 92.6% of the prize money paid by the BNP Paribas Open and the Miami Open ($7,379,023.40 for the Madrid Open vs. $7,972,535.00 for both the BNP Paribas Open and the Miami Open).  Similarly, in 2019, the Madrid Open paid 86.8% of the prize money paid by the BNP Paribas Open and the Miami Open ($7,255,136.60 for the Madrid Open vs. $8,359,455.00 for both the BNP Paribas Open and the Miami Open).

**Answer:**     ATP denies the allegations in Paragraph 57, except admits that Paragraph 57 accurately states the amount of prize money that the BNP Paribas Open and the Miami Open were required to pay in 2018 and 2019.

58.     In 2020, before it was canceled due to the COVID-19 pandemic, the Madrid Open was set to pay $5,921,602.50 in prize money, 86.7% of the prize money set to be paid at the BNP Paribas Open and the Miami Open ($6,834,140.00), despite being scheduled to have just 66.7% of the tournament days.

**Answer:**     Denied.

59.     In 2021, the Madrid Open was required to pay $3,179,451 in prize money, *95%* of the $3,343,785 in prize money paid by the Miami Open in 2021.  Prize money for the 2021 BNP Paribas Open has not yet been announced.

**Answer:**     ATP denies the allegations in Paragraph 59, except admits that Paragraph 59 accurately states the amount of prize money the Miami Open was required to pay in 2021.

60.     By repeatedly abusing and exceeding its discretion by requiring the Madrid Open to pay disproportionately high prize money commitments without honoring the eight-day exclusivity and player participation commitment made to the Madrid Open, the ATP has deprived Super Slam of the benefits of its bargain under the Sanction Agreement.

**Answer:**     Denied.

61.     Notably, and consistent with the foregoing facts, prior correspondence from ATP, including a letter from former CEO Mark Miles, suggested it would be appropriate if all combined men's and women's events such as the Madrid Open were allotted twelve days like BNP Paribas and Miami, but no such change has yet been implemented.

**Answer:**     ATP denies the allegations in Paragraph 61, except lacks sufficient knowledge to admit or deny the allegations concerning a letter from former CEO Mark Miles.

62.     ATP, by its own Rules, claims the discretion to set prize money for each of its tournaments each year.  *See* Rule 3.08(A)(1) ("Prize money shall be distributed based on breakdowns established by ATP."); Rule 3.09 ("Each ATP Tour and ATP Challenger Tour tournament is required to offer and pay as part of its financial commitment the on-site prize money shown in 'Exhibit J' [of the ATP Rules] plus hotel accommodations, unless otherwise determined by ATP."); Rule 9.02(B) ("Prize money must be paid in a manner consistent with the breakdown approved by ATP.").

**Answer:**     ATP admits that it has the discretion to set prize money of each of its tournaments

each year and admits that Paragraph 62 accurately quotes portions of Rules 3.08(A)(1)(a), 3.09,

and 9.02(B) of the ATP Rulebook, and respectfully refers the Court to the Rulebook for a full

statement of its contents in context.

63.     Details regarding the formula ATP uses to calculate prize money for lower-tier, ATP Tour 500-level tournaments are set forth in the ATP Rules.  *See* Rule 3.19.  In contrast, the ATP Rules do not set forth a formula for determining the prize money for the different Masters 1000-level tournaments.

**Answer:**     ATP admits the allegations in the first sentence of Paragraph 63 and denies the

remaining allegations in Paragraph 63.

64.     The lack of a formula to determine prize money for Masters 1000-level tournaments has also, since 2011, been an express breach of the Application and thus the Sanction Agreement. Section 2.6 of the Application states: "No later than 2011 future prize money changes will be determined, and any increases will be funded, from a formula that allocates a portion of revenue growth to prize money.  The formula will be developed by a committee appointed by the Board, and will be approved by the Board after review by the Player and Tournament Members."

**Answer:**     ATP denies the allegations in Paragraph 64, except admits that Paragraph 64

accurately quotes section 2.6 of the Application and respectfully refers the Court to the Application

for a full statement of its contents in context.

65.     ATP has not fulfilled this requirement, which was an essential benefit under the Sanction Agreement for the Madrid Open.  The failure to fulfill this requirement also flatly contradicts any assertion by ATP that Super Slam's protections under the Sanction Agreement somehow do not extend to the present day and the period covered by this action.

**Answer:**     Denied.

66.     As a result of ATP's failure to comply with the Sanction Agreement, ATP has been able to abuse and exceed its discretion to impose discriminatory prize money amounts for the Madrid Open that are incommensurate with prize money requirements imposed on other 1000-level tournaments, taking into account the number of days of unconflicted exclusivity which each of the tournaments has been granted. This discriminatory treatment is especially abusive as the amounts of prize money required to be paid by the Madrid Open have substantially increased since the Sanction Agreement was entered into, so that it would reasonably be expected that the Madrid Open would not continually be required to pay a higher level of prize money than other comparable eight-day events.

**Answer:**     Denied.

67.     On August 1, 2018, Madrid Open President Gerard Tsobanian wrote to then-ATP President Chris Kermode requesting "8 *full days* of tournament," pointing out that the Madrid Open pays 27% more in prize money than other comparable Masters 1000-level tournaments. But no change was made to the ATP's bad faith scheduling and prize money decision-making.

**Answer:**     ATP denies the allegations in Paragraph 67, except admits that on or about August 1, 2018, Mr. Tsobanian sent a letter to then-ATP President Chris Kermode, and respectfully refers the Court to that letter for a full statement of its contents in context.

68.     On February 14, 2020, Super Slam owner Ion Tiriac wrote to current ATP President Andrea Gaudenzi stating that "Madrid has now many years the status similar to Indian Wells and Miami (same prize money) but without the benefits those two tournaments enjoy…specifically…the additional days they have versus what we have in Madrid." As Tiriac further complained, "Madrid is on paper an 8-day event," but that as a result of this scheduling, "year after year" "[w]e have had repeatedly a case of a Murray, a Zverev, a Federer" arriving late to the Open which "undermine[s] our ability to sell tickets for the first four days of our event," thereby "damag[ing] [the Madrid Open's] reputation."

**Answer:**     ATP denies the allegations in Paragraph 68, except admits that on or about February 14, 2020, Mr. Tiriac sent a letter to ATP Chairman Andrea Gaudenzi and ATP CEO Massimo Calvelli, and respectfully refers the Court to that letter for a full statement of its contents in context.

69.     On October 21, 2020, Tiriac again wrote to Gaudenzi, explaining that "when Madrid has only 8 days, in effect reduced to 5 because of the two ATP 250 events scheduled the week before[,] that cause[s] serious and damaging restrictions to our scheduling program."

**Answer:**      ATP denies the allegations in Paragraph 69, except admits that on or about October 21, 2020, Mr. Tiriac sent a letter to Mr. Gaudenzi, and respectfully refers the Court to that letter for a full statement of its contents in context.

70.      Despite these complaints, the ATP has continued to breach its contractual commitments and obligations of good faith and fair dealing to Super Slam with respect to the scheduling decisions, top player commitment, and prize money requirements imposed upon the Madrid Open.

**Answer:**      Denied.

71.      ATP also cannot justify its conduct by reliance on Section 6.4 of the Application, which states that "The Applicant agrees to comply with the following: (i) the ATP Certificate of Incorporation; (ii) the ATP By-Laws; (iii) the rules set out in the ATP Official Rulebook; (iv) all resolutions of the Board of Directors of the ATP; and (v) all other rules, regulations, and governing agreements among the ATP and its members; as each of such documents are amended, supplemented and/or restated from time to time." ATP's conduct goes far beyond any mere amendment, supplementation, or restatement of these applicable documents, and any claim by ATP that it can unilaterally alter the fundamental terms of the Sanction Agreement would be an unreasonable interpretation of the contract and violate the covenant of good faith and fair dealing.

**Answer:**      Denied.

72.      Nor can ATP rely upon Section 6.7 of the Application, which states that "[n]othing in this Application shall prevent or restrict the ATP from continuing to refine its format and tournament specifications consistent with ATP Rules and By-laws." ATP's conduct as reviewed herein is nowhere near being something that merely "refine[s]" its format and tournament specifications. Instead, ATP has engaged in repeated discriminatory conduct against Super Slam to deprive it of essential terms of the Sanction Agreement, and any claim that these are only refinements of ATP's format and specifications would make a mockery of ATP's contractual commitments to Super Slam.

**Answer:**      Denied.

## COUNT I

### (BREACH OF CONTRACT)

73.      Plaintiff realleges and incorporates by reference each of the above allegations as if set forth fully herein.

**Answer:**      ATP repeats and incorporates by reference each of its answers to Paragraphs 1 through 72 as if fully set forth herein.

74.  The Sanction Agreement constitutes a valid and binding contract.

**Answer:**  Paragraph 74 contains legal conclusions to which no answer is required.

75.  In the Sanction Agreement, Defendant agreed to provide Plaintiff with an eight-day tennis tournament, during which period ATP's fifty top-ranked players would be fully available to participate in all Masters 1000 Tournaments (including the Madrid Open), with the exception of up to one tournament per year for certain players, including playing and promotional activities.

**Answer:**  Denied.

76.  Defendant repeatedly has breached the Sanction Agreement including Section 2.5 thereof (granting an eight-day tournament), and threatens to continue to do so, by scheduling other ATP tournaments to overlap with the Madrid Open, thereby effectively only providing Plaintiff with at most five days of tournament play without a conflicting ATP sanctioned tournament or player travel days. As a result, numerous top players have been unavailable to participate for a full eight days. Further, ATP has repeatedly scheduled another Masters 1000 tournament to conflict with the final day of the Madrid Open.

**Answer:**  Denied.

77.  Defendant also repeatedly has breached the Sanction Agreement including Section 2.2 thereof (the "mandatory player commitment" and commitment that there would be "[n]o change in current rule for Masters events"), and threatens to continue to do so, by granting players exemptions from participating in the Madrid Open that are not permitted under the Sanction Agreement, and by requiring that only the top thirty rather than top fifty players participate.

**Answer:**  Denied.

78.  Defendant has further breached the Sanction Agreement by setting the prize money that the Madrid Open is required to pay contrary to the terms of that Agreement—including that the prize money after 2011 be set based on a formula as provided in Section 2.6 of the Sanction Agreement—and inconsistent with the tournament's status thereunder.

**Answer:**  Denied.

79.  As a direct and proximate result of Defendant's breaches of contract, Plaintiff has suffered and will continue to suffer significant harm and damages, in an amount to be determined at trial, but which are many millions of dollars and substantially exceed $75,000 for the last three years, the period for which Super Slam is seeking damages. Plaintiff also has and will continue to suffer irreparable harm for which it has no adequate remedy at law.

**Answer:**  Denied.

## COUNT II

## (BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING)

80.     Plaintiff realleges and incorporates by reference each of the above allegations as if set forth fully herein.

**Answer:**     ATP repeats and incorporates by reference each of its answers to Paragraphs 1 through 79 as if fully set forth herein.

81.     Delaware law implies a covenant of good faith and fair dealing in all contracts.

**Answer:**     Paragraph 81 contains legal conclusions to which no answer is required.

82.     The implied covenant of good faith and fair dealing requires that Defendant refrain from arbitrary or unreasonable conduct that has the effect of depriving Plaintiff from receiving the benefit of its bargain. This is particularly true where discretion is conferred on one party over matters impacting the other party's reasonably expected benefits of its bargain under the contract.

**Answer:**     Paragraph 82 contains legal conclusions to which no answer is required.

83.     Defendant has breached, and threatens to continue to breach, the implied covenant of good faith and fair dealing under the Sanction Agreement by exercising its claimed discretion over scheduling and the setting of prize money in an unreasonable manner that served: (1) to deprive Plaintiff of its right to an exclusive eight-day tournament in which the ATP Tour's top players are fully available to play and participate in promotional activities, with limited exceptions specified in the Sanction Agreement as described above; and (2) to deprive Plaintiff of its reasonable expectation that it would not be required in future years to pay a level of prize money that is substantially higher than that required of other comparable eight-day, 1000-level tournaments in Europe in a discriminatory manner that has no reasonable justification, especially as the level of prize money has substantially increased since the 1000-level sanction for the Madrid Open was granted.

**Answer:**     Denied.

84.     As a direct result of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiff has suffered and will continue to suffer significant harm for which it seeks damages for the period of 2018 to 2021, in an amount to be determined at trial, but which is many millions of dollars and substantially in excess of $75,000. Plaintiff also has and will continue to suffer irreparable harm for which it has no adequate remedy at law.

**Answer:**     Denied.

## INJUNCTIVE RELIEF

85.     Plaintiff will be irreparably harmed if ATP is not enjoined from (i) denying Plaintiff its contractual right to an exclusive eight-day tournament by continuing to schedule other ATP events to overlap or otherwise conflict with the Open; (ii) setting prize money requirements for the Madrid Open in a discriminatory manner that are incommensurately high in comparison to other similar eight-day tournaments in Europe, and contrary to the terms of the Sanction Agreement; and (iii) retaliating against Super Slam or the Madrid Open in any way for this litigation.

**Answer:**     Denied.

86.     Monetary damages are not an adequate remedy for the harm caused to Plaintiff by ATP's repeated and ongoing breaches, because—while it is clear and demonstrable that Super Slam has suffered severe losses of profits as a result of ATP's misconduct—it is impossible to fully determine all of the business, promotional, and other opportunities that have been and would be lost to Super Slam due to conflicting tournaments in the future, or the future losses Super Slam will suffer from discriminatory, but presently unknown, prize money requirements that will otherwise be imposed upon the Madrid Open in the future.

**Answer:**     Denied.

## AFFIRMATIVE DEFENSES

ATP asserts the following affirmative defenses and reserves the right to amend its Answer to assert any additional affirmative defenses when and if, in the course of its investigation, discovery, or preparation for trial it becomes appropriate to assert such additional affirmative defenses.  In asserting these defenses, ATP does not assume the burden of proof for any issue that would otherwise rest with Super Slam.  ATP has not knowingly or intentionally waived any applicable affirmative defenses.

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Super Slam's claims are barred, in whole or in part, by applicable statutes of limitations.

## Third Affirmative Defense

Super Slam's claims are barred, in whole or in part, by the doctrines of laches, waiver, unclean hands, and/or estoppel.

## Fourth Affirmative Defense

Super Slam's claims are barred, in whole or in part, by its acquiescence to the actions about which it now complains.

## Fifth Affirmative Defense

Super Slam's claims are barred, in whole or in part, because any alleged loss or damage Super Slam has sustained is the result of Super Slam's own fault, failures, acts, or omissions.

## Sixth Affirmative Defense

Super Slam's claims are barred, in whole or in part, because Super Slam has suffered no damages resulting from any act or omission by ATP.

## Seventh Affirmative Defense

Super Slam's claims are barred, in whole or in part, by Super Slam's failure to mitigate damages.

## Eighth Affirmative Defense

Super Slam's claims are barred by its express waiver of all claims against ATP under section 3.2 of ATP's Bylaws.

## Ninth Affirmative Defense

Super Slam's claims are barred by its agreement to abide by all decisions, rulings actions of the ATP Board of Directors and its Chief Executive Officer under section 3.2 of ATP's Bylaws, and its agreement to be bound by ATP's rules and regulations under section 1.06 of the ATP Rulebook.

**Tenth Affirmative Defense**

Super Slam's claims are barred, in whole or in part, because some or all of Super Slam's alleged damages are speculative and not recoverable.

**Eleventh Affirmative Defense**

On information and belief, Super Slam's claims are barred because it lacks standing.

**Twelfth Affirmative Defense**

Super Slam is not entitled to injunctive relief because any alleged injury to Super Slam is not immediate or irreparable and Super Slam has an adequate remedy at law for any alleged injury.

**PRAYER FOR RELIEF**

WHEREFORE, ATP respectfully requests that the Court:

    i.    dismiss Super Slam's Complaint and all of its claims in their entirety, with prejudice;

    ii.    enter judgment in ATP's favor and against Super Slam on its Complaint;

    iii.    award ATP its Litigation Expenses pursuant to, and as defined in, section 23.3(a) of ATP's Bylaws; and

    iv.    grant ATP such other and further relief as this Court may deem just and proper.

ASHBY & GEDDES

*Of Counsel:*

/s/ Tiffany Geyer Lydon
_____

Bradley I. Ruskin
Jordan B. Leader
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000
bruskin@proskauer.com
jleader@proskauer.com

Philip Trainer, Jr. (#2788)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
ptrainer@ashbygeddes.com
tlydon@ashbygeddes.com

Dated: September 15, 2021

*Attorneys for Defendant*

{01723986;v1 }

24